Yes, good morning, your honors. May it please the court. I'm Christopher Sproul for Plaintiffs Inland Empire Waterkeeper and Orange County Coastkeeper. The central issue in this appeal is whether citizens can bring claims for violations of any condition in a Clean Water Act National Pollutant Discharge Elimination System permit, often referred to as NPDES permit, without necessarily proving that the permit holder has also had unlawful discharges of pollutants to waters of the United States, and instead have the ability to enforce any NPDES permit condition, including purely procedural or what are sometimes referred to as non-discharge provisions in NPDES permits that are designed to create a prophylactic system for preventing pollution before it happens and to inform regulators. I'm not sure that's the issue either way you frame it is really the issue in front of us. You do agree there has to be a discharge to establish jurisdiction, don't you? No, no, no. Court after court has held that that's not the case, that there has to be, and again I guess it depends on what one means by jurisdiction, but if we're talking about Clean Water Act statutory jurisdiction under the Clean Water Act. Why do you have the vertical three standing based on the failure to file a report? How does the failure to file a report cause any injury to members of the organization that's fairly traceable to the failure to file the report? Well the U.S. Supreme Court following the rule that emerged in FEC v. Atkins would say of course there can have standing for failure to provide information that's required by public statute to inform the public and perhaps targeted regulatory agencies. I recognize Lujan says that if it's a procedural statutory right that the test is even more lenient than it normally is, but there still has to be something. What is the injury that happened on the failure to file the reports? Well we have, first off, the premise we have violations of non-discharge requirements that go far beyond just filing a report. But just to answer your question. The legal law says we have to do claim by claim and remedy by remedy, and so one of your sets of claims is the failure to file the report, so that's why I'm focusing. Okay. What is the injury, even under the very lenient standard, what injury is fairly traceable to members of your organization from the failure to file a report? Okay. We're just focusing on that one of four aspects of failure to follow NPS procedural permit requirements. And that one requirement, the Sierra Club, the Simpkins Industry case, 847 Fed 2nd, 1109, at page 115, 4th Circuit, 1988, is a case right on point. In that case, there was a claim only for failure to provide reports. Standing was challenged. Standing was upheld by the 4th Circuit. That case was cited with approval by this court in Northwest Environmental Advocates versus City of Portland. That's a case that's in the briefs. It's 56 F3rd 979. And what Simpkins says is... Maybe I'm missing something here, so you need to help me. Your clients submit declarations that say, we live in this area or we come to this area, we enjoy these waters, and they've been polluted by this defendant. And that establishes Article III standing, does it not? It does. In the absence of that, let's assume Judge Seiler, who's never been to this area of the country, filed a Clean Water Act case claiming that Corona didn't do all the things you claim it didn't do. Would he have standing? No. And again, the teaching here is the U.S. Supreme Court... So I want to understand what your arguments are here. You have to have somebody with Article III standing who claims some injury, correct? Under American Canoe, a 6th Circuit case, which follows... Well, don't tell me what the cases say. Just give me your answer. Could Judge Seiler bring this lawsuit? If Judge Seiler were to bring this lawsuit, anyone, including us, would have to show an interest in the information. That the information is something that they are going to use, and the deprivation of that information would harm them. And if Judge Seiler has no interest in Temescal Creek... I thought the case law required more. I thought the case law required for Article III standing... And by the way, I think, at least in general, your clients have that standing. But it required that they say something like... In the normal environmental case. I hike these trails. I go by this river. I don't think it's... You think it's just enough to say, I'm really interested in this information. Because I'm writing a book. Or I'm an environmentalist in general. See, I think you've got more here. But I'm pushing back on your notion that you don't need more. Well, I think we do have more. But I don't think we need more. I mean, American Canoe and the Supreme Court decision. And the Federal Election Commission decision. All you have to show is that you would use the information for some real purpose. And if that information is deprived to you, that's an informational injury. Do you make a showing that they would have used the information in the reports that were not filed? Is that something that was in an actual presentation in the District Court? That's an excellent question, Your Honor. And there isn't extensive development in the record of that, I will acknowledge. But that's because standing was granted at summary judgment. And we were expressly told by the District Court judge... We have an independent... Article 3 standing is jurisdictional. We have an independent obligation to determine it at any time. And if it's missing, then that's a problem. Well, if it is a problem, it's a problem created by the District Court's case management and not calling for more evidence at trial. Well, all that might suggest is that we should send it back for somebody to establish standing. The question is, is there any evidence in this record of standing on an informational basis, as you assert? Only in the sense of indirect. In the same sort of indirect information that Sierra Club v. Simpkin Industries, the Fourth Circuit decision, found was adequate. And that this court, in the City of Portland case, endorsed and said yes. That it stands to reason that if you care about a water body, you're going to care about the information about whether it's being polluted or not. Can I ask you to switch to a different topic? County of Maui comes out after this case is decided, correct? That's correct, Your Honor. Okay, and County of Maui requires a direct discharge into the waters of the United States or its functional equivalent. I think that's a fair summary of what it says. Even putting aside whether or not the answer to the request for admission should have been introduced into the record at trial, is there any evidence in this record of a direct discharge? Yes, there's a plethora of evidence. Where would I find it? It's on page 13 through page 15 of our opening brief. But you make reference there mostly to the admission. So what is there besides the admission? The admission only talks about an indirect discharge. What else is there that shows that they've discharged? Yes, there were nine points of evidence that we refer to in our brief, along with record citations. And again, one, the facility is located a short distance, 1,100 feet uphill from Temescal Creek, making it reasonable to infer that water is going to run down this hill into the creek below. Two, stormwater laden with various pollutants from the facility flows into a pipe that transmits stormwater downhill, under a road, and onto a floodplain adjacent to, and still uphill from the creek. And it's only a short distance. It's only 1,100 feet. Three, Corona submitted not only the request for admission response, but to the regulators. They submitted multiple documents saying, we discharged to Temescal Creek. So I have a question about County of Mallory. They submitted an NOI, quote, unquote. I have a question about County of Mallory. Let me interrupt you. This case was tried under the Ninth Circuit law that preceded the Supreme Court's decision. It was, yes, Your Honor. But the Supreme Court characterized our pre-County, Supreme Court County of Mallory law, and our fairly traceable test, as extreme. And it was extreme in the sense of being too permissive, too complaintive. So why would we, if it's a defense verdict under an extreme reading of the law that's overly permissive, why would we send it back to retry under a narrower standard? If you lost under the broader one, then it's harmless error. It makes no difference. Why would we send it back? That's a good question, Your Honor. But the answer is it was not tried under the more lenient Ninth Circuit standard. You just said it was. That was exactly what I asked you. And you said yes. Excuse me, Your Honor, but that was the governing law. The jury was not instructed as to that governing law. That's one of the errors. That may be counsel's fault for not implementing the law as it was said at the time. Well, whoever's error it was, it's ultimately the court's responsibility to give jury instructions that follow the law. Isn't your answer a different one? Isn't your answer is we can't tell what the jury found? All we know is that the jury answered question number one, no. It's possible that they didn't think it flowed in. You know, we don't know. So that's what led to my question. Whatever we rule in this case on the other issues, doesn't it have to be retried with respect to the county of Maui issue? Everybody, both at summary judgment and at trial, whether or not the instructions were proper or not, everybody operated under the assumption that, as Judge Collins says, the Ninth Circuit's previous more lenient standard applied. We now know it doesn't. Intervening law has come through. Isn't the normal circumstance there to send? Assuming there's no other reason to affirm or reverse, isn't that the normal process here to send everything back to the trial court and say, hey, sorry, the law changed. You've got to start all over again. I wouldn't take issue with that, Your Honor. I think that's OK. Is that true as to your summary judgment also? It could well be that there were errors throughout the district court's approach that would mandate a wholesale redoing of the case. But we wouldn't necessarily go that far, and that the errors that tainted the outcome really go to the defense verdict, not the plaintiff verdict. Well, but I read the summary judgment. The trial judge, and you can't fault him for this because it was the law at the time, sort of said, well, there's no real dispute about discharging the waters of the United States. I've got this request for admission where these guys say they indirectly discharge waters into the creek. And it may be logically that that would establish direct discharge, but he didn't make a finding on that. He just said, we're not even fighting about that. So at least don't we have to ask him whether the record supports direct discharge? It depends to answer what question. Because, again, our view is that we do not need to prove that there was a discharge that actually reached waters of the United States. One, to have authorization under Clean Water Act Section 505, the citizen supervision, to bring claims for non-discharge permit violations, the amicus brief from the State Water Resources Control Board, the agency that co-administers the Clean Water Act in California agrees with that position. Let me ask a question about that. I thought their position was, and I may have it wrong, you don't need to have a current or imminent discharge, as long as you had one at some point in the past. You think their position is, you don't even need to have a discharge in the past? Not as an element of proof. I would say, perhaps, I don't recall that particular discussion in the amicus brief, but I'm well versed in this. I'm a former staff attorney for the U.S. Environmental Protection Agency, and I well know the law in this area in that to have Clean Water Act jurisdiction, there's a Second Circuit case that establishes there has to have been at least one discharge. Okay. Okay, so you and I have been missing each other on this. There has to be at least one discharge to have Clean Water Act jurisdiction, correct? There is case law that would say so, yes. Okay. And the issue in this case on Gwaltney, for me, is whether that Gwaltney requires that that discharge be either imminent or expected or after the time of the filing of the complaint, or whether it's just enough for jurisdictional purposes to have one in the past and current violations. I thought that was the issue this case framed. You seem to be suggesting that one could bring a Clean Water Act case for reporting violations if there never had been any discharge. Yes, I do, and here's why. Here's why. We're talking past each other a bit on the question of jurisdiction. There is a requirement for a regulatory agency before it can require an NPDES permit that there have been at least one discharge to waters in the United States. That's the Waterkeeper Second Circuit decision. But once that's happened, then the regulatory agency gets jurisdiction to issue an NPDES permit. Once someone has an NPDES permit, the Congress has seen fit. You cannot challenge a Clean Water Act permit in an enforcement proceeding. That's Clean Water Act Section 509, 33 U.S.C. Section 1369. Okay, so we're saying the same thing. So let me make sure we are saying the same thing. Because they have a permit, there must have been a discharge, right? For the permit to have been validly issued, there had to have been a discharge. Okay, and therefore, from your perspective, that's enough to meet the jurisdictional requirements, and now you don't need an additional discharge, in your view, to make a claim relating to non-discharge violations. I would agree with that. And, of course, the evidence that there was at least one discharge is they filed a notice of intent with the regulatory agency that said that. That said, yes, we have had a discharge. We are a Clean Water Act. Okay, so that takes me to the question that you spent most time on in your briefing. How do you read Gwaltney? Yeah, Gwaltney, I think it's only amenable to one reading, given the language later in the Supreme Court Gwaltney opinion, which says, of course, citizens can enforce any provision of an NPS permit, that the requirement that there be an ongoing violation is a requirement that there be an ongoing violation of the type that the citizen is meaning to enforce. And in Gwaltney, the only violation alleged was the discharge, right? Yes, in Gwaltney, there was. I believe that's true. I know that this much is true. There was a discharge violation alleged, whether there was. Right. See, as I read, and I want to ask your friend this, too. Gwaltney seems to say, if you're suing about discharges, you just can't sue about a discharge that occurred at some distant point in the past because this is an injunction statute. You've got to show that another violation is either occurring or is likely to occur because we don't give injunctions just about things that occurred distantly in the past. Is that a fair reading of Gwaltney in your view? Yes, absolutely. But of the same type of violation that you are proceeding against. So if you're proceeding against monitoring and reporting violations, you must show that there will be a repeat of monitoring and reporting violations. You couldn't show, well, there's going to be a repeat of discharge violations. Therefore, I should be able to bring my monitoring and reporting violations. You have to show a repeat of the type of violation that you're proceeding against, but only of that type. That's what Gwaltney stands for. And the district court, when it looked at it again, said, you know, that may well be the right reading. Let's send it to the circuit to resolve. I've noticed, Your Honors, I only have a minute left, and I didn't. We'll give you a little bit of extra time on rebuttal because we've taken you past the time when you wanted to stop. Thank you. Mr. Veach. Thank you, Your Honors. Brian Veach for Corona Clay Company. I will say this. One of the things I heard was, I think from Judge Hurwitz, was, well, if you're on the permit, doesn't that mean you're discharged? I would disagree with that, that what happens is regulators will come and say, hey, you should be on the permit. We think your water is going to, you know, drain to a storm drain or whatever. And a company can say, we're going to fight that, or they can just say, you know what, easier to be on the permit. So when you go on to and you file your NOI, as he was referencing the notice of intent, what they call the SMARTS database, you go to fill that out, and you're given a click down of which body of water does your water potentially go to. You don't get to say none. You pick one. So it is not, being on the permit is not by itself evidence of a discharge. Although, in this case, it seems to me we have a practical problem, which is that there seems to be plenty of evidence of discharge before filing with a complaint. And you really don't contest that. I don't even see that you contest in your brief that they couldn't show, if they were required to, that the discharge was directly into the waters of the United States. Nobody ever tried that. Nobody ever tried that because of Maui. They tried it under the previous law. So if the nature of the discharge is important, and you admit it to at least in your request for admission, an indirect discharge, shouldn't we send that back for trial? Not at all, Your Honor. I think, first of all, County of Maui, first of all, the district court made it clear to them before trial that, hey, if you want to argue groundwater, you want to argue this broader standard, you can do it. They didn't make that argument because it doesn't apply. There's nothing in the record to indicate that water came close, water came near, and I would actually say that there was what we submitted. Well, you did admit that your stormwater flows indirectly into the creek, correct? That's in the request for admission, correct. And you admitted it? It's in the request for admission, yes. Okay. And I've looked at the maps and the other stuff submitted. It's pretty clear the creek flows directly into the river, which is the water of the United States. Yeah, and there's some evidence at trial that the creek actually runs through a big basin for a Vulcan rubber company. It never gets to the river. Nobody was ever asked to make a finding about that. And if they had known a finding about that was necessary, they might have either sent a different request for admission or put in different proof. This happens all the time when the law changes when a case is on appeal. You can't blame them for not making the case that the law on appeal required. On the other hand, we can't punish you for that either. We send it back and retry it. Is that the appropriate thing to do? Not when the law that we were operating under, which was the Ninth Circuit's decision in County Maui, was more generous to them. And that's the whole point of what Judge Carter said. Go ahead and argue it. But that wasn't their argument. Their argument was the water comes slowing down. It was never, ever part of their case. That takes me to a point we didn't get to discuss. Why didn't Judge Carter make a mistake in not telling the jury that the fact that your client indirectly discharges stormwater into the creek has been admitted? I've never seen a trial where somebody was required to put an admitted fact in front of the jury as opposed to having the judge say, this fact has been stipulated and admitted, and so you should take it as true. Well, I think we do cite some cases where courts did do that. Number one, you look at it. I think they can. A must thing? I don't think it's a must. I think it's discretionary, right? And I think, you know, whenever you talk about discretion, you look at, you know, discretion is here is a reasonable choice, and here is a reasonable choice, and somewhere in there is where the court operated within its discretion. And you have to think about it. I'm sorry. Why would the jury have to decide something that's already settled? But I don't understand. In terms of what the request for admission said? Yeah. Yeah, well, because the request for admission only goes so far, which is something we point out, right? Indirectly to doesn't mean it actually reaches Temescal Creek. And, by the way, the request for admission really just tracks what the stormwater pollution prevention plan says. So it was cumulative. The jury had already heard it. They had already pointed it out. They had already talked about it. The request for admission, when it first was raised with Judge Carter, was the evidentiary record already closed, or was it still open and had everyone rested their cases? Everyone had rested, Your Honor. Yes. What do you think we need to do here? Should it be sent back for a new trial, or are you appealing on other issues? Well, I am appealing on other issues. I think that the grant of summary judgment on the first cause of action was improvidently granted. And I think part of it — And your argument on that is a Gwaltney issue, right? It is Gwaltney, but it's also based upon Section 301, which, as the Ninth Circuit has said before — I'm sorry, Section 311, or 1311, which says the prohibition on discharge is the cornerstone and the foundation of the Clean Water Act. I mean, that is the — it is about the water. And so — And that's what I was trying to get to with your friend here. Let me give you a hypothetical. And I'm saying it's a hypothetical in advance so you don't need to say those are not the facts of this case. I won't. I won't. And make it — let's assume your client is Three Mile Island, and the government imposes a bunch of reporting requirements to prevent a nuclear disaster, and your client ignores the reporting requirements. And the nuclear disaster would inevitably pollute the waters of Lake — of Allegheny River or whatever river goes by. Are you saying you can't — a Citizens Clean Water Act case can't lie until the disaster actually occurs? No, I wouldn't say that, Your Honor. And I think that the Third Circuit, in one of the cases we cited, sort of addressed this point and said, yeah, you know, we won't go to the point of the Fifth Circuit, where the Fifth Circuit said, hey, if you don't have a discharge violation, you don't have a — you don't have standing for a reporting violation. And Third Circuit said, well, we're not going to go that far. But you have a redressability issue, right, where your claim about paperwork doesn't match up with the relief that you want. And I think that might be sort of what makes sense to me. Okay, so if there is an entire prohibition, if we're somewhere closer to the Third Circuit approach, in your view, why isn't the fact that there were discharges in the past, and you haven't, according to them, adopted the appropriate technology or reporting mechanism to avoid future ones, sufficient to give rise to a Clean Water Act claim? Well, I would say that, first of all, if we use discharges as the definition that they use in their complaint and that was used throughout trial, which is discharges to navigable waters, that that wasn't established, even in the past, Your Honor. That that was not actually... Assume for a moment, because I don't want to get back into the fight about the County of Maui changing the rules, but let's just assume for a moment that they could establish discharges into navigable waters in the past and reporting and monitoring violations continuing. Would that be enough to give rise to a Clean Water Act claim? I think it possibly could, Your Honor, and I think that that's why the cases that they cite and they say, such as Pacific Lumber, where the court says, hey, you can bring just procedural violations. Well, yeah, when it's connected to a case where there's actual discharge that's proved or established or admitted or conceded, then you've got, okay, well, part of that is you didn't do your paperwork, right? But what they are contemplating is you didn't do your paperwork. We can just bring a cause of action based on that, period. No, but I'm asking a different question, and that's why I said it, because if there were simply no discharge whatsoever in the past, I take it your position would be that you couldn't bring a Clean Water Act claim. That's absolutely true, yes, I would agree with that. If there were one, your position seems to be you could. Possibly, Your Honor, but, again, we didn't have that here, but possibly you could tie this. We're back in hypothetical land. I'm still asking. Assume there were one here. Why wouldn't there be a Clean Water Act claim? I think there still needs to be a tie between, you know, either witness statements or the standing declarations between that paperwork and that previous discharge, right? Somehow there's some link between it that fits within the article. Okay, so now back to this case, and assume a previous discharge just for the moment. Sure. They say you were supposed to put in certain types of machinery, protective measures that were designed to protect against discharges, and you haven't done so. It may or may not be true, because, you know, we don't get to that issue given the jury verdict. Why isn't that enough to trigger a Clean Water Act claim? If you say—are we talking about the BMPs, for example? Yes. You didn't put in a catch basin, and that doesn't have it. Well, the catch basin doesn't matter if you don't have discharge, right? The whole purpose of the BMP is to prevent discharge. That's why that is the essence. I know, but we're talking past each other. You have a past discharge for purposes of my question. Okay, okay. The citizens come in and say, there hasn't been a discharge since we filed the complaint, but they still haven't put in the kind of BMP necessary to prevent future discharges. Would that be enough for them to proceed under the Act? And I'm going to give you a classic answer on that, Your Honor, and say it depends. I guess it depends on how long ago the discharge was. I hate to answer it like that, but I think that's the answer. If the discharge was, you know, a month ago, right, and then you say, hey, you don't have this BMP, you should put a BMP in place because you had this discharge a month ago. If you got a discharge two years ago and that's it, then what's the purpose of this BMP? See, the reason I ask is because as I read, and I pronounce the name wrong every time, to go out there, whatever it's called. As I read it, you wouldn't even need a BMP violation if you had a discharge a month ago. You could just come in and say there was a discharge very shortly ago, and therefore we have a right to sue for discharge violations, even though they're not continuing, because it's a reasonable inference that we need an injunction to stop it. So it seems to me that, you know, anyway, I don't know that we're not mixing up our facts here. I'm not sure either, and I think, you know, it really does kind of depend on the imminence of it, and we don't have that imminence. They came up with an expert that said, I didn't even check to see whether water reached Temesco Creek. Didn't even bother. So there's just a lack of evidence. Well, that's why the jury decided what the jury decided. And so if we go back to the summary judgment ruling, which I do want to make a point on appeal, that's where Judge Carter said, well, you don't need a discharge when you've got a BMP violation. It can just be by itself. Well, a couple of problems with that. Number one, like I said, the reason you put a BMP in here, the BMP we put in was this huge catch basin that catches the water. And that's why it was put in there. So they did have a BMP in there in place. And so that BMP is supposed to reduce discharge, right? If your water has got pollutants in it, then you've got an obligation to either get rid of the pollutants and then let it flow on or try to minimize that flow. And that's what they did with their BMP. And that's what Judge Carter ignored in his summary judgment ruling. And he basically said, no, I see these violations from 2017, 2016, that's it. Well, that goes against Gwaltney. And that ignores the BMP that was put in place that prevented discharge, that led to the jury ultimately finding what it did, and which, as we argue, pretty extensively leads to lack of jurisdiction, whether you look at it as statutory jurisdiction or Article III jurisdiction. Something I wanted to point out, Your Honors, and I just, you know, I hate to be a cynic. Well, maybe I don't. But I think some dates to keep in mind here, they get the summary judgment order where they get granted relief on their first cause of action and fifth cause of action on June 10th, 2019. Trial happens in October 2019. There's some post-trial briefing. And then it's not until March 23rd, almost 10 months later, 10 months later that Waterkeeper says, here's this injunctive relief we want. So I think what that indicates is this case isn't about water. Because they had already won on summary judgment back in June. And if you're really concerned about the water and what might happen to the water, well, they were halfway there. They had probability of success. All they had to show was harm or imminent harm. They didn't bother. I think it's A, because they don't care, or B, they knew it was not a problem. Or C, because we simply don't know and it's not relevant to anything in front of us, right? Well, I would think that the whole point of the injunctive relief that the court awarded and that they ultimately asked for was that there's some sort of imminent harm, right? So did you make an argument on appeal that even if you violated the statute, injunctive relief wasn't appropriate because of latches on the part of Coast Keeper? I wouldn't call it latches, Your Honor. Would I call it? No, I don't know. Whatever you call it. Did you make that argument on appeal? Yes, we did. We put it in our briefs that there was no showing of irreparable harm that could justify the injunctive relief. But your argument was because they didn't prove a discharge. Well, of course. I mean, that's part of it. But you didn't argue it was because they waited too long to seek the injunctive relief, did you? Oh, no, no. No, we didn't. But we did. We left with lack of irreparable harm. But now you're making that argument to us. No, I'm just saying that it establishes a lack of irreparable harm. And I'm also saying, Your Honor, what it shows is that this case is not about concern about water. It's about money. And that's why they're looking for, gee, can't we just bring causes of action based upon reporting violations? Because, you know, it's going to make life pretty easy for them. They can go on a smarts database, pull up a report, and say, well, this report doesn't look good. This report doesn't look good. Find a member that says, I don't like these reports. Does any of that matter if Congress has given them a cause of action that lets them do that? Why do we care whether they do it with impure motives or more venal motives? If Congress has allowed them to do it, then they can do it. Why is this relevant? I think it's relevant, Your Honor, because, again, this also goes to the whole statutory argument that we make about Section 1318 not being part of the tools, statutory tools that are in 1365F. But if you're asking whether it's not relevant, to me, Your Honor, it's important. It's a nice jury argument, maybe, but you're not a jury. I apologize. You know, I think that unless you've got further questions, I think I made probably the main points. I mean, I think that a $3.7 million penalty in this case is absurd based upon what's happened, but I think that's all set forth adequately in our briefs. I will point out one thing. I did have a question, and it was the one Judge Collins began with, with Mr. Sproul. And, again, assume these facts just for the moment. Let's assume there is a discharge into the navigable waters, a complaint, and there are continuing reporting and BMP violations, if you will, but no evidence of another discharge. Would citizens in Mr. Sproul's client's position have Article III standing to bring a suit about the reporting violations under that circumstance? I apologize, Your Honor. I kind of lost track of that. I was thinking about the first part. Can I hear it again? Look, I don't want you to address the situation where there's never been a discharge. Somebody just brings a suit and says there hasn't been reporting. I understand that situation. I'm not sure I know what the answer is. I'm asking about this situation. Assume there's a discharge on day one. A year later, somebody brings a suit and says there's continuing reporting and equipment violations, BMP violations. Do they have Article III standing to bring that lawsuit? I'm not hypothetical. I would say no, Your Honor, because they're not meeting the fairly traceable element of that aspect that was laid out in Laid Law. I think that you probably have a redressability issue, too, as well, that was laid out in Laid Law. So what do you do with the language in Gwaltney that says, well, we're not saying they can't sue for reporting violations. We're just saying they can't sue for these discharge violations. I'm not sure what statement in Gwaltney you're referring to. Gwaltney sort of limits. There's language in Gwaltney that sort of says we're not dealing today with reporting violations. So it just says we're not ruling about that. We're talking about discharge violations. Yeah, and Gwaltney also was dealing with, as Laid Law later said, dealing with the statutory standing issue, right? Laid Law sort of laid out, you know, I think 13 years later, the Article III issue. Yeah, okay. I got you now. Thank you. Anything further? I'm sorry. Were you done, Mr. Nietzsche? Yeah, I think, you know, there's other points, but I think we've laid it out in our briefs. I don't really think I have anything further to convey. Why don't we put two minutes on the clock for Mr. Sproul? Thank you, Your Honors. Yeah, I'll try to be brief. First off, the discussions from my colleague about how CoronaClay has remedial measures in place. They have this big catch basin, and that's caught all the stormwater. There wasn't evidence of that before the trial court. In their Rule 60 motion, they brought forth new evidence, and they had a supposed expert, an engineer, say, Look, we've built this brand-new, you know, big basin, and we've calculated it, and we think it will hold back all the stormwater. Well, in response to that, we went out into the field with video cameras during a big rain event in April 2020, and it's in the record we've provided to the court. Stormwater streaming out of the site, across the floodplain, and into Temescal Creek. Unmistakable evidence to rebut their post-judgment evidence that the basin had not eliminated all discharges, number one. And number two, to the extent if this were ever, for any reason, if this were to go back down for further proceedings, is there any question about, well, is it really standing? Is Article 3 standing, Matt? Does Article 3 standing require that there have been an actual discharge? We have that. Now, we couldn't have presented it to the district court because that storm event happened after the trial and after judgment. But it was, in our view, we can't be held to or accused of having done something improper. And we were responding to evidence and arguments made from the defense that, well, if there ever was risk of discharges, they've been eliminated. And I see I have ten seconds. You don't need to use them all. I would just say that we do most assuredly care deeply about the environment. I don't think we're concerned about either side's motives in this case. Fair enough. Thank you very much, Your Honor. Thank both counsel for their briefing and arguments in this very interesting case. Thank you, Your Honor. It will be submitted, and we will be in recess for the day. Thank you all. Thank you, Your Honors.
judges: Siler, Hurwitz, Collins